# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
### AUGUSTA DIVISION

| | | |
|---|---|---|
| James E. King, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **CASE NUMBER: 1:12-CV-00193** |
| John M. McHugh, Secretary, | ) | |
| Department of the Army, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, James King, by and through his attorney, Chuck Pardue, submits this Memorandum in Opposition to Defendant's Motion for Summary Judgment.

## I.  INTRODUCTION

Plaintiff, James King, filed this action alleging racial discrimination and reprisal on December 20, 2012 and an amended complaint on March 15, 2013. (Docs. 1 and 7). Plaintiff seeks damages and equitable relief under Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. § 2000e et seq. (Doc. 7). All of Mr. King's claims with the exception of Plaintiff being charged 3 days AWOL in early September in reprisal for an August 23, 2010 EEO charge, have been dismissed. This Court should not grant Defendant's motion for summary judgment because Mr. King suffered a material adverse action by being marked AWOL on September 1, 2010, and there is a genuine issue of material fact whether the Defendant's actions were motivated by reprisal and there proffered reason is a pretext.

## II.   STATEMENT OF FACTS

Plaintiff James King has been employed as a Police Officer at Fort Gordon since January 2009. At all times relevant, Plaintiff's immediate supervisor was Lieutenant (Lt.) Richard Peloquin and his second-level supervisor was Chief Willie McClinton. On July 22, 2010 Plaintiff was injured at work while apprehending a suspect. Mr. King was treated for his injuries at the Dwight D. Eisenhower Army Medical Center Emergency room at Ft. Gordon.

On July 27, 2010 Major (MAJ) Sheryl evaluated Mr. King for a return to duty assessment. Dr. Bendo recommended bed rest until July 30, 2010 due to continued swelling and pain. On August 17, 2010, Mr. King was still having problems with his knees and returned to Dr. Bendo, who referred Mr. King to Sports Medicine and placed him out of work until a specialist could evaluate Mr. King's injuries. Mr. King scheduled an appointment with Sport's Medicine for September 1, 2010. On August 23, 2010 Plaintiff filed an EEO complaint against Lt. Peloquin for an unrelated matter. See Affidavit of James E. King attaches as Exhibit 1.

Prior to September 2, 2010 Mr. King had been on leave under workmen's compensation. King Test., 4/14/2014 Deposition Tr. 34:4-6, attached as Exhibit 2. Plaintiff communicated through email that he would not be returning to work until after September 7, 2010 and tried to work out through various emails and phone conversations with Lt. Peloquin if his leave for September 1, 2, and 6, 2010 should be traumatic injury or regular leave. Following his appointment at Sports Medicine, Plaintiff was cleared to return to duty with physical restrictions. On September 10, 2010, the first day Mr. King was scheduled to work after he provided his return date of September 7 via email, Plaintiff returned to work. In retaliation for Mr. King's EEO complaint Lt. Peloquin marked Mr. King AWOL for September 1, 2, and 6 (Labor

Holiday), 2010 King affidavit, 18 March 2013, paragraphs (10)-(14), pages 2-3 attached as Exhibit 3.

Under DA leave policy and procedures an employee who is absent on sick leave for three or more consecutive days must submit medical documentation to support the use of sick leave when the employee returns to work.  The CBA has a similar policy that occurs after five absences. (Defendant's Statement of Facts ¶15 and 17).Plaintiff did not bring in a doctor's note, because he had not violated the policy. King Test., 4/14/2014 Deposition Tr. 34:19-25, attached as exhibit 4.

The table below shows Mr. King's work schedule for the days at issues:

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
|  |  |  | 1<br>Mr. King has apt. with sports medicine and did not come to work.<br>**Marked AWOL**-rescinded through union procedures | 2<br>Mr. King does not return to work.<br>**Marked AWOL** | 3<br>Not Scheduled to Work | 4 |
| 5 | 6<br>**LABOR DAY**<br>King who is on light duty does not return to work.<br>**MARKED AWOL** | 7<br>Mr. King uses annual leave | 8<br>Not Scheduled to Work | 9<br>Not Scheduled to Work | 10<br>King returns to work | 11 |
| 12 | 13 | 14 |  |  |  |  |

Mr. King did not come into work on September 6, 2010, Labor Day, because he was on light duty, and policy is that if you cannot do your complete job then you do not come in on holidays when the pay is increased. By regulation all officers have to be in full duty status to preform law enforcement duties on Fort Gordon. See affidavit of Lee V. Brit attached as Exhibit 5.

Following the marking of AWOL, Mr. King tried to address the issue with the chief, Major Nyals and Major Chamberlin; when they were unresponsive Mr. King filed an EEO complaint alleging retaliation by Lt. Peloquin.  King Test., 4/14/2014 Deposition Tr. 45:1-4, 48:10-21, attached as exhibit 6.  Mr. King is the only person that Lt. Peloquin has ever marked AWOL.  Mr. King was able to get the September 1, 2010 AWOL rescinded I February 2011 through the union grievance procedure, King Test., 4/14/2014 Deposition Tr. 47:22-25, attached as exhibit 7; however the September 2 and September 6 AWOL charges are still in effect because Mr. King allegedly failed to request and receive approval for those days, even though the routine practice in the office was to place personnel on regular leave and prepare leave requests after an absence.

As a result of being marked AWOL, Mr. King was required to take a loan from his Thrift Savings Plan in order to pay his bills. King Test., 4/14/2014 Deposition Tr. 49:16-20, attached as exhibit 8. In addition, the marking of AWOL has the potential to affect his earning capacity since the AWOL is on his file and may prevent him from getting a different position or a security clearance. King Test., 4/14/2014 Deposition Tr. 55:23-25, 56:1-4 attached as exhibit 9.

Defendant filed a Motion for Summary judgment asserting that Mr. King's retaliation claim for being marked AWOL on September 1, 2010 should be dismissed because Mr. King did not suffer any adverse action since the charge was reversed through the union grievance

procedure. In addition the Defendant asserts that retaliation claim for the remaining claims should be dismissed because Mr. King is unable to demonstrate that the proffered reason is a pretext. Plaintiff submits this brief in opposition to Defendant's Motion for Summary Judgment on the retaliation claim.

### III. MEMORANDUM OF AUTHORITIES AND ARGUMENT

#### A. Summary Judgment pleading standard

Under the Federal Rules of Civil Procedure summary judgment is appropriate if no genuine issues of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The party moving for summary judgment has the burden of identifying the absence of genuine issues of material fact. *Four Parcels of Real Property*, 942 F.2d 1428, 1438 (11th Cir. 1991). Once the moving party meets its burden, the nonmoving party must support the allegations of the pleadings with particular materials in the record. Fed. R. Civ. P. 56(c)(1).

When determining if there is a genuine issue of material fact, a reviewing court is required to view all evidence in the light most favorable to the nonmoving party. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir. 2003.)

#### B. Burdens of Proof in a Title VII Retaliation Claim

A prima facie case of retaliation is established when a Plaintiff is engaged in activity protected by Title VII, Plaintiff knew he was engaged in the protected activity, the Defendant afterwards took an adverse employment action against Plaintiff, and there is a casual connection between the protected activity and the adverse employment action or harassment. *Smith v. City of Salem, Ohio*, 378 F.3d 566 (6th Cir. 2004); *Hunter v. Secretary of Army*, 565F.3d 986 (6th Cir. 2009). Once the Plaintiff makes a prima facie case, there is a presumption that the employer

retaliated against the plaintiff, and the burden or production then shifts to the employer to provide a legitimate, nonretaliatory reason for the adverse action. *See McDonnell Douglas v. Green*, 411 U.S. 792 (1973).   If the employer provides evidence of a legitimate reason for the adverse action, the burden shifts to the employee to demonstrate that the proffered reason is a pretext. *Patrick v. Ridge*, 394 F.3d 311, 315-16 (5th Cir. 2004).

Defendant's motion for summary judgment incorrectly asserts that since Mr. King had the AWOL rescinded through a union grievance that he is unable to show that he suffered from an adverse action by being marked AWOL on September 1, 2010 and that Mr. King is unable to demonstrate that the reason offered by the Defendant is a pretext.

C. **Defendant's Motion for Summary Judgment for the September 1, 2010 AWOL charge should be denied because the AWOL was a material adverse action**

Defendant incorrectly asserts that Plaintiff's September 1, 2010 AWOL Charge must fail because the decision to mark the Plaintiff AWOL was rescinded through union procedures, and as a result of the AWOL being rescinded the Plaintiff did not suffer any adverse action. In support of its Motion to Dismiss Defendant relies on *Davis v. Town of Lake Park Florida*, 245 F.3d 1232 (11th Cir., 2001).  In *Davis*, a Title VII discrimination case, the court concluded that the incidents complained of by Davis did not, viewed individually or collectively, amount to adverse action. The court emphasized in its decision that it was undisputed that Davis did not suffer any reduction in salary, loss of benefits, denial of promotions, workplace reassignment, transfer, or change in permanent job title as a result of these incidents, and that the Plaintiff continued to receive excellent or satisfactory performance evaluations. *Id.*

Unlike in *Davis*, Mr. King lost wages as a result of the discriminatory and retaliatory act of being marked AWOL. Therefore, King did suffer an adverse action. Mr. King had to go

through a union grievance procedure to recover the funds for being inappropriately marked AWOL and his income was not provided to him for months after informal and formal appeals. The fact that King has recovered a portion of his lost wages through a union grievance does not eliminate the adverse action. In the context of a claim of Title VII retaliation, a "materially adverse action" means one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Crawford v. Carroll*, 529 F. 3d 961, 973-974 (11th Cir. 2008) (*quoting Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 2415 (2006)); *Rodriguez v. Secretary, U.S. Dept. of Homeland Sec.*, 518 Fed. Appx. 653, 655 (11th Cir. 2013). In King's case he filed an EEO complaint against his supervisor on August 23, 2010; then on September 1, 2010 in retaliation for the EEO complaint the Plaintiff was marked AWOL by his supervisor for attending a doctor's appointment related to the care and treatment of his on the job injury. The lost wages and the difficulty of having to go through union procedures over 5 months to recover lost income would dissuade a reasonable worker from making an EEO complaint. In addition, Mr. King had to take a loan out on his Thrift Savings Plan in order to pay his bills. Therefore, Mr. King suffered and continues to suffer from an adverse action and the Defendant's motion for summary judgment should be denied.

**D. Defendant's Motion for summary judgment should be denied because Mr. King can demonstrate that the reasons offered by the Defendant are a pretext.**

In its motion for Summary Judgment the Defendant asserts that Mr. King's claim of retaliation for being Marked AWOL on September 2, 2010 and September 6, 2010 must fail because the Army offers a legitimate, nonretaliatory reason for marking Mr. King AWOL and Mr. King is allegedly unable to demonstrate that the reason provided is a pretext.

Defendant alleges that Mr. King was marked AWOL because he refused to follow the established leave procedures. Under DA leave policy and procedures an employee who is absent on sick leave for three or more consecutive days must submit medical documentation to support the use of sick leave when the employee returns to work.  The CBA has a similar policy that occurs after five absences. (Defendant's Statement of Facts ¶15 and 17). Mr. King did not violate either of these policies, therefore, Mr. King can demonstrate that the explanation offered by the Defendant is a pretext.

The table below shows Mr. King's work schedule for the days at issues.

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
|  |  |  | 1<br>Mr. King has apt. with sports medicine and did not come to work. **Marked AWOL-** rescinded through union procedures | 2<br>Mr. King does not return to work. **Marked AWOL** | 3<br>Not Scheduled to Work | 4 |
| 5 | 6<br>**LABOR DAY**<br>King who is on light duty does not return to work. **MARKED AWOL** | 7<br>Mr. King uses annual leave | 8<br>Not Scheduled to Work | 9<br>Not Scheduled to Work | 10<br>King returns to work | 11 |
| 12 | 13 | 14 |  |  |  |  |

Mr. King did not violate the DA policy which the Defendant asserts is a legitimate nonretaliatory reason for marking Mr. King AWOL.  As the above schedule clearly shows, Mr. King did not miss three consecutive days on sick leave. Therefore, he was not required to submit medical documentation, and no violation occurred. Without a violation of the DA policy there is no justification for marking Mr. King AWOL on September 1, 2, and 6, 2010 and Mr. King can demonstrate that the reason offered by the Defendant is a pretext. Therefore, Defendant's Motion to Dismiss should be denied.

## IV.   CONCLUSION

Defendant's motion for Summary judgment should be denied because Mr. King suffered a material adverse action by being marked AWOL on September 1, 2010, and there is a genuine issue of material fact weather the Defendant's actions were motivated by reprisal and there proffered reason is a pretext.

This the 27<u>   </u> th day of June 2014.

<u>   s/Chuck R. Pardue   </u>
Chuck R. Pardue
Attorney for Plaintiff
Georgia Bar No. 561212

211 Bobby Jones Expressway, Suite A
Martinez, Georgia 30907
(706) 823-2000 Fax (706) 722-0149
chuckpardue@gmail.com

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF GEORGIA

### AUGUSTA DIVISION

| | | |
|---|---|---|
| James E. King, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **CASE NUMBER: 1:12-CV-00193** |
| John M. McHugh, Secretary, | ) | |
| Department of the Army, | ) | |
| | ) | |
| **Defendant.** | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on June 27ᵗʰ, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification to all counsel of record.

      *s/ Chuck R. Pardue*
Chuck R. Pardue
Attorney for Plaintiff
Georgia Bar No. 561212

211 Bobby Jones Expressway, Suite A
Martinez, Georgia 30907
(706) 823-2000 Fax (706) 722-0149
chuckpardue@gmail.com

# Exhibit 1

**AFFIDAVIT OF JAMES E. KING**
**March 18, 2013**

Personally appeared before the undersigned officer, duly authorized by law to administer oaths, JAMES E. KING, who resides at 2049 Glenn Falls, Grovetown, Georgia 30813 and states on oath that the following facts sworn in this Affidavit are true and correct:

Lt. Peloquin, my former civil service supervisor, harmed me by downgrading my performance evaluations, marking me AWOL; causing embarrassment and loss of pay when he should have approved sick leave or regular leave, and creating a hostile working environment for me from July 2009 until March 2011 as reprisals for my prior EEO activity:

(1) After I provided testimony in support of Officer Watson on December 15, 2009, I was giving a rating of Meet Standard on my annual performance rating by my formal supervisor Lt. Peloquin. Ratings I received prior to being a witness for Officer Watson had always been marked "Excellence". I have 15 years of government service, most of which as a police officer. Lt. Peloquin, as my supervisor, took adverse actions against me in reprisal. Lt. Peloquin requested I write a statement for him about the incident between him and OFC Watson that had occurred July 12, 2009. I told Lt. Peloquin that it would not benefit him and I would be testifying for OFC Watson in an EEO complaint against Lt. Peloquin. From that time forward he harassed me making my work experience miserable. His evaluation of me some months later was the first opportunity, other than continuing harassing remarks, which Lt. Peloquin had to retaliate against me and affect my performance evaluation since he knew I would be testifying on behalf of OFC Watson.

(2) On December 15, 2009, Lt. Peloquin put an entry in my annual performance rating that stated that I had missed five days in two months due to illness in which I believe discrimination under the Americans with Disability Act. Lieutenant Peloquin knew that I had a long term respiratory disability requiring weekly shots. There were other officers in our unit at Fort Gordon that were out more than me but he didn't put that on their ratings.

(3) Since approximately December 2009 and through March 2011 Lt. Peloquin continued to retaliate against me with disparaging remarks and unfounded criticisms creating a hostile working environment for me.

(4) On August 19, 2010, Lt. Peloquin contacted my doctor to get her to have me come in to supervise a blotter clerk after she had already recommended that I stay home due to my on the job injuries.

(5) On September 12, 2010, Lt. Peloquin retaliated against me again because I had complained on August 23, 2010 and filed an EEO complaint about Lt. Peloquin attempting to change my doctor's opinion and marked me AWOL September 1st, 2nd and 6th. I filed a formal complaint of retaliation on October 1, 2010.

(6) On December 19, 2009, I received my performance appraisal from my former supervisor Lt. Peloquin. Lt. Peloquin gave me a Meet Standard and added that I had been out sick 5 days on my rating. In which I know is reprisal for my involvement in an EEO concerning another officer on July 14, 2009.

(7) Prior to by protected EEO activity I did not have a one single negative counseling statement. Other officers including ones that I trained and were from time to time written up with negative counseling statements but all of them received Exceeds on their ratings from Lt. Peloquin. I went to the Chief McClinton and Major Nutter who was Provost Marshall at the time with my concerns about Lt. Peloquin and asked him to do an in house investigation. My concerns were not addressed by either person. So I then filed an EEO complaint.

(8) After the EEO complaint, the Chief McClinton only addressed the issue of my illness from the bullets on my appraisal. In turn only because Civilian Personnel advised him too, I brought to Chief McClinton's attention numerous complaints between December 2009 and September 2010 about being harassed by Lt. Peloquin and nothing was done.

(9) On July 22, 2010 I was injured on the job from a scuffle with a subject that I was trying to detain. As a result my left thumb and both knees were injured from making contact on the ground. Although I attempted to return to work earlier I developed problems with my hand and knees. I went for treatment on August 17, 2010 and was told by the doctor not to return to work until I seen a specialist. On August 19, 2010 before a specialist could be arranged to see me with my X-rays, , Lt. Peloquin called the doctor that treated me and asked her to change my status to have me come to work as a blotter clerk.

(10) To the best of my knowledge and belief Lt. Peloquin never requested a physician clarification for other officers in our unit that Lt. Peloquin supervised, such as white Officers, Heron and Fapiano, who were out on medical leave after being injured; even when the injury was not in the direct line of duty of arresting and subduing a suspect. Receiving from my physician my private medical information and attempting to improperly influence her medical decision process was a violation of my medical privacy and another action of reprisal against me. I went to the Chief again with my concerns and still nothing was done. And I was still left under Lt. Peloquin supervision. Lt. Peloquin has not called any other officer's doctor in our unit concerning their medical leave statement to have it changed.

(11) In retaliation for my protected EEO activity on September 12, 2010, Lt. Peloquin charged me AWOL for the September 1st, 2nd and 6th. I was out those days from a work related injury. Lt. Peloquin claimed that he marked me AWOL because I did not have a doctor's note. I had emailed Lt. Peloquin that I was going to be out those days due to the injuries that I had sustained. Lt. Peloquin left a phone message or emailed me back saying that he would have to charge me either workman's comp or I would have to use my personal leave for those days, When we communicated on September 2, 2010, the options were traumatic leave, sick leave, or regular leave. He did not state that he was going to charge me AWOL. He stated that if I wanted to be

out on workman comp then I would have to bring a doctor's note for that time off. No other officer had ever been charged AWOL even the ones who didn't call to say there were not coming in. The practice in our unit is if a person is out they have up to five days to put in for regular leave if medical leave is not approved. I communicated with Lt. Peloquin on September 2, 2010 I and informed him I would have medical document once my physician had been given the opportunity to review my x-rays and clarified my physical duties.

(12) When I returned to work on September 10, 2010 Lt. Peloquin stated to me that he had changed his mind and marked me AWOL for those days. Lt. Peloquin said that I needed a doctor's note for those days. I had already given him a CA17 light duty form which was sign by the doctor stating my injuries. I did not understand why I needed another doctor's note if my injury is already documented. One of the days, September 6, 2010 was a holiday in which I should have been on holiday leave.

(13) Lt. Peloquin stated that he already knew that I was out from my injuries that I had sustained from work. It is my understanding that I do not need a doctor's note until I am out for more than 5 days according to Fort Gordon regulations. Even after the 5 days, the practice in our unit was you are given a week to turn in a doctor's note after returning to work. As part of the continuing retaliation and hostile work environment LT Peloquin retaliated against me for my prior EEO involvement and complaints about his improper interference with my physician by changing his mind and marking me AWOL for September 1st, 2nd, and 6th, 2010. I had communicated with him concerning my situation and gave me the option to take personal leave. Then he changed his mind on September 12, 2010 and marked me AWOL when I came in to work on September 10. I attempted to have this corrected with Lt. Peloquin's supervisor who delayed acting for five months and then only gave me back one day traumatic leave but refused to change the other days to normal leave.

(14) Who would mark a police officer AWOL for an injury he incurred while performing their police duties? Obviously this was a personal matter to him. This was once again brought to my agency supervisor's attention and nothing was done. Five months later and two days prior to my EEO Fact Finding Hearing the Chief removed the September 1 AWOL day. However, they did not remove the AWOL for the Holiday Labor Day, September 6, 2010.

(15) Despite numerous complaints to my supervisors for 1 ½ years (December 2009 to March 2011) my agency failed to protect me against reprisal from LT. Peloquin. Lt. Peloquin was making harassing phone calls to me, singling me out and inappropriately criticizing my conduct. For example, he called me, but no one else, and said according to his watch that I was late, when in fact I was on time. Lt. Peloquin caused great stress to me and my family due to his continuous harassment. I was having frequent headaches and had to see my doctor for job related stress and I was placed on stress medication. I was then forced to take money out of my retirement plan for the days that he unfairly marked me AWOL to cover my mortgage payment. I am the only officer that I and my co-workers know about that was charged with AWOL.

Page 3

(16) This has been ongoing issue with Lt. Peloquin for over nine years he had been reprising against Police Officers under him and finally he has been removed. Chief McClinton stated to several officers to write letters about Lt. Peloquin actions and he will take it from there. Several Officers did so before with zero outcomes from the Chief.

(17) Our command did not take EEO complaints serious and the outcome of that is a lack of moral and resulted in other Officers in our unit at Fort Gordon, making statements like "nothing happened to Lt. Peloquin so I'm not worried about anything happening to me if I do wrong." There have been numerous EEO complaints filed against LT Peloquin with little or no corrective action taken by the Agency.

(18) Even after I filed my EEO complaint against Lt. Peloquin it did not stop his actions to retaliate against an individual who supported my complaints. Police Officer Melinda testified for me in my EEO hearing on February 17, 2011. Officer Melinda's rating went from being an excellent Officer to someone that didn't know there job and needed to approve their English. I have been with the government for 15 years and never witnessed someone still supervising a person that has an EEO on them especially for reprisal. When he did not allow me to use sick leave or regular leave request for 2, 5, and 6 September 2010 it became my second EEO on Lt. Peloquin for reprisal. This should never been allowed to happen with an already pending EEO.

(19) When they took out the $850.00 pay lost because of the AWOL I had to at great inconvenience obtain funds from my retirement to cover my mortgage. Lt. Peloquin's retaliations from my EEO complaints against him has caused me emotional distress, embarrassment, and damaged my reputation in the law enforcement community at Fort Gordon.

_____
AFFIANT

Sworn to and subscribed before me
this 18th day of March, 2013.

_____
Notary Public
My Commission Expires:       Notary Public, Burke County, Georgia
                             My Commission Expires May 14, 2014

# Exhibit 2

James E. King    4/14/14    King vs. Department of the Army

1  would either put me -- if I still have workmen's comp

2  leave, he will let me use that; if not, he will let me use

3  either my annual or sick leave.

4      Q    What type of leave had you been on prior to

5  September 2nd, 2010?

6      A    Workmen's comp.

7      Q    Did you have any remaining worker's comp leave?

8      A    I'm not sure.  I think I might have had one day

9  left.  I'm not sure about that.

10     Q    To your understanding, was that standard

11 procedure, Mr. King?

12     A    For workmen's comp?

13     Q    In terms of Lieutenant Peloquin's response as to

14 allowing you to take annual leave, sick leave, or workers'

15 comp leave?

16     A    Yes.

17     Q    Following receiving the response from Lieutenant

18 Peloquin, did you contact him further at that time?

19     A    Yes.  I think he said something about to bring

20 in a doctor's note.  Afterwards he e-mailed me back and

21 said I was going to need a doctor's note.  And I had

22 e-mailed him back and said, you know, "Why do I need a

23 doctor's note?"  You know, because it ain't been more than

24 three days.  You know, policy is three days, more than

25 three days, you need a doctor's note.

                                                    34

# Exhibit 3

## AFFIDAVIT OF JAMES E. KING
### March 18, 2013

Personally appeared before the undersigned officer, duly authorized by law to administer oaths, JAMES E. KING, who resides at 2049 Glenn Falls, Grovetown, Georgia 30813 and states on oath that the following facts sworn in this Affidavit are true and correct:

Lt. Peloquin, my former civil service supervisor, harmed me by downgrading my performance evaluations, marking me AWOL; causing embarrassment and loss of pay when he should have approved sick leave or regular leave, and creating a hostile working environment for me from July 2009 until March 2011 as reprisals for my prior EEO activity:

(1) After I provided testimony in support of Officer Watson on December 15, 2009, I was giving a rating of Meet Standard on my annual performance rating by my formal supervisor Lt. Peloquin. Ratings I received prior to being a witness for Officer Watson had always been marked "Excellence". I have 15 years of government service, most of which as a police officer. Lt. Peloquin, as my supervisor, took adverse actions against me in reprisal. Lt. Peloquin requested I write a statement for him about the incident between him and OFC Watson that had occurred July 12, 2009. I told Lt. Peloquin that it would not benefit him and I would be testifying for OFC Watson in an EEO complaint against Lt. Peloquin. From that time forward he harassed me making my work experience miserable. His evaluation of me some months later was the first opportunity, other than continuing harassing remarks, which Lt. Peloquin had to retaliate against me and affect my performance evaluation since he knew I would be testifying on behalf of OFC Watson.

(2) On December 15, 2009, Lt. Peloquin put an entry in my annual performance rating that stated that I had missed five days in two months due to illness in which I believe discrimination under the Americans with Disability Act. Lieutenant Peloquin knew that I had a long term respiratory disability requiring weekly shots. There were other officers in our unit at Fort Gordon that were out more than me but he didn't put that on their ratings.

(3) Since approximately December 2009 and through March 2011 Lt. Peloquin continued to retaliate against me with disparaging remarks and unfounded criticisms creating a hostile working environment for me.

(4) On August 19, 2010, Lt. Peloquin contacted my doctor to get her to have me come in to supervise a blotter clerk after she had already recommended that I stay home due to my on the job injuries.

(5) On September 12, 2010, Lt. Peloquin retaliated against me again because I had complained on August 23, 2010 and filed an EEO complaint about Lt. Peloquin attempting to change my doctor's opinion and marked me AWOL September 1st, 2nd and 6th. I filed a formal complaint of retaliation on October 1, 2010.

(6) On December 19, 2009, I received my performance appraisal from my former supervisor Lt. Peloquin. Lt. Peloquin gave me a Meet Standard and added that I had been out sick 5 days on my rating. In which I know is reprisal for my involvement in an EEO concerning another officer on July 14, 2009.

(7) Prior to by protected EEO activity I did not have a one single negative counseling statement. Other officers including ones that I trained and were from time to time written up with negative counseling statements but all of them received Exceeds on their ratings from Lt. Peloquin. I went to the Chief McClinton and Major Nutter who was Provost Marshall at the time with my concerns about Lt. Peloquin and asked him to do an in house investigation. My concerns were not addressed by either person. So I then filed an EEO complaint.

(8) After the EEO complaint, the Chief McClinton only addressed the issue of my illness from the bullets on my appraisal. In turn only because Civilian Personnel advised him too, I brought to Chief McClinton's attention numerous complaints between December 2009 and September 2010 about being harassed by Lt. Peloquin and nothing was done.

(9) On July 22, 2010 I was injured on the job from a scuffle with a subject that I was trying to detain. As a result my left thumb and both knees were injured from making contact on the ground.  Although I attempted to return to work earlier I developed problems with my hand and knees. I went for treatment on August 17, 2010 and was told by the doctor not to return to work until I seen a specialist. On August 19, 2010 before a specialist could be arranged to see me with my X-rays, , Lt. Peloquin called the doctor that treated me and asked her to change my status to have me come to work as a blotter clerk.

(10) To the best of my knowledge and belief Lt. Peloquin never requested a physician clarification for other officers in our unit that Lt. Peloquin supervised, such as white Officers, Heron and  Fapiano, who were out on medical leave after being injured; even when the injury was not in the direct line of duty of arresting and subduing a suspect. Receiving from my physician my private medical information and attempting to improperly influence her medical decision process was a violation of my medical privacy and another action of reprisal against me. I went to the Chief again with my concerns and still nothing was done. And I was still left under Lt. Peloquin supervision. Lt. Peloquin has not called any other officer's doctor in our unit concerning their medical leave statement to have it changed.

(11) In retaliation for my protected EEO activity on September 12, 2010, Lt. Peloquin charged me AWOL for the September 1st, 2nd and 6th. I was out those days from a work related injury. Lt. Peloquin claimed that he marked me AWOL because I did not have a doctor's note. I had emailed Lt. Peloquin that I was going to be out those days due to the injuries that I had sustained. Lt. Peloquin left a phone message or emailed me back saying that he would have to charge me either workman's comp or I would have to use my personal  leave for those days.  When we communicated on September 2, 2010, the options were traumatic leave, sick leave, or regular leave. He did not state that he was going to charge me AWOL. He stated that if I wanted to be

out on workman comp then I would have to bring a doctor's note for that time off. No other officer had ever been charged AWOL even the ones who didn't call to say there were not coming in. The practice in our unit is if a person is out they have up to five days to put in for regular leave if medical leave is not approved. I communicated with Lt. Peloquin on September 2, 2010 I and informed him I would have medical document once my physician had been given the opportunity to review my x-rays and clarified my physical duties.

(12) When I returned to work on September 10, 2010 Lt. Peloquin stated to me that he had changed his mind and marked me AWOL for those days. Lt. Peloquin said that I needed a doctor's note for those days. I had already given him a CA17 light duty form which was sign by the doctor stating my injuries. I did not understand why I needed another doctor's note if my injury is already documented. One of the days, September 6, 2010 was a holiday in which I should have been on holiday leave.

(13) Lt. Peloquin stated that he already knew that I was out from my injuries that I had sustained from work. It is my understanding that I do not need a doctor's note until I am out for more than 5 days according to Fort Gordon regulations. Even after the 5 days, the practice in our unit was you are given a week to turn in a doctor's note after returning to work. As part of the continuing retaliation and hostile work environment LT Peloquin retaliated against me for my prior EEO involvement and complaints about his improper interference with my physician by changing his mind and marking me AWOL for September 1st, 2nd, and 6th, 2010. I had communicated with him concerning my situation and gave me the option to take personal leave. Then he changed his mind on September 10, 2010 and marked me AWOL when I came in to work on September 10. I attempted to have this corrected with Lt. Peloquin's supervisor who delayed acting for five months and then only gave me back one day traumatic leave but refused to change the other days to normal leave.

(14) Who would mark a police officer AWOL for an injury he incurred while performing their police duties? Obviously this was a personal matter to him. This was once again brought to my agency supervisor's attention and nothing was done. Five months later and two days prior to my EEO Fact Finding Hearing the Chief removed the September 1 AWOL day. However, they did not remove the AWOL for the Holiday Labor Day, September 6, 2010.

(15) Despite numerous complaints to my supervisors for 1 ½ years (December 2009 to March 2011) my agency failed to protect me against reprisal from LT. Peloquin. Lt. Peloquin was making harassing phone calls to me, singling me out and inappropriately criticizing my conduct. For example, he called me, but no one else, and said according to his watch that I was late, when in fact I was on time. Lt. Peloquin caused great stress to me and my family due to his continuous harassment. I was having frequent headaches and had to see my doctor for job related stress and I was placed on stress medication. I was then forced to take money out of my retirement plan for the days that he unfairly marked me AWOL to cover my mortgage payment. I am the only officer that I and my co-workers know about that was charged with AWOL.

Page 3

(16) This has been ongoing issue with Lt. Peloquin for over nine years he had been reprising against Police Officers under him and finally he has been removed. Chief McClinton stated to several officers to write letters about Lt. Peloquin actions and he will take it from there. Several Officers did so before with zero outcomes from the Chief.

(17) Our command did not take EEO complaints serious and the outcome of that is a lack of moral and resulted in other Officers in our unit at Fort Gordon, making statements like "nothing happened to Lt. Peloquin so I'm not worried about anything happening to me if I do wrong." There have been numerous EEO complaints filed against LT Peloquin with little or no corrective action taken by the Agency.

(18) Even after I filed my EEO complaint against Lt. Peloquin it did not stop his actions to retaliate against an individual who supported my complaints. Police Officer Melinda testified for me in my EEO hearing on February 17, 2011. Officer Melinda's rating went from being an excellent Officer to someone that didn't know there job and needed to approve their English. I have been with the government for 15 years and never witnessed someone still supervising a person that has an EEO on them especially for reprisal. When he did not allow me to use sick leave or regular leave request for 2, 5, and 6 September 2010 it became my second EEO on Lt. Peloquin for reprisal. This should never been allowed to happen with an already pending EEO.

(19) When they took out the $850.00 pay lost because of the AWOL I had to at great inconvenience obtain funds from my retirement to cover my mortgage. Lt. Peloquin's retaliations from my EEO complaints against him has caused me emotional distress, embarrassment, and damaged my reputation in the law enforcement community at Fort Gordon.

_____
AFFIANT

Sworn to and subscribed before me
this 18th day of March , 2013.

_____
Notary Public
My Commission Expires:  Notary Public, Burke County, Georgia
My Commission Expires May 14, 2014

# Exhibit 4

Case 1:12-cv-00193-JRH-BKE   Document 37   Filed 06/27/14   Page 24 of 36

James E. King   4/14/14   King vs. Department of the Army

1   would either put me -- if I still have workmen's comp

2   leave, he will let me use that; if not, he will let me use

3   either my annual or sick leave.

4        Q     What type of leave had you been on prior to

5   September 2nd, 2010?

6        A     Workmen's comp.

7        Q     Did you have any remaining worker's comp leave?

8        A     I'm not sure.  I think I might have had one day

9   left.  I'm not sure about that.

10       Q     To your understanding, was that standard

11   procedure, Mr. King?

12       A     For workmen's comp?

13       Q     In terms of Lieutenant Peloquin's response as to

14   allowing you to take annual leave, sick leave, or workers'

15   comp leave?

16       A     Yes.

17       Q     Following receiving the response from Lieutenant

18   Peloquin, did you contact him further at that time?

19       A     Yes.  I think he said something about to bring

20   in a doctor's note.  Afterwards he e-mailed me back and

21   said I was going to need a doctor's note.  And I had

22   e-mailed him back and said, you know, "Why do I need a

23   doctor's note?"  You know, because it ain't been more than

24   three days.  You know, policy is three days, more than

25   three days, you need a doctor's note.

# Exhibit 5

# WITNESS AFFIDAVIT

James King vs. John M. McHugh, Secretary of the Army
EEOC Case No. 410-2011-00368X
DA Docket No. ARGORDON10AUG03877

Date: June 1, 2012

1. My name is: Leo V. Birt

2. My address is: 4703 Weldon Adams Drive, Hephzibah, GA 30815

3. My phone numbers are: H - (706) 796-6994, C - (706) 691-1081

During the time OFC King was injured in the line of duty, he showed me documentation signed by a medical doctor placing him in a limited duty status. I believe the limit was for (3) days. I believe the situation between Lt Peloquin and OFC King is of a personal nature. During the time of the limited duty, Lt Peloquin marked OFC King as A WOL which I believe was not necessary and certainly not true. By regulations all officers have to be in a full duty status to perform Law Enforcement duties on Fort Gordon. OFC King took his complaint to the Chief of Police which overturned (1) of the three days. I went into the Chief of Police officer with OFC King and the Chief exact words was "this is the best that I can do, I brief". If OFC King was indeed A WOL for three days why would the Chief of Police over turn the Supervisor (Lt Peloquin) decision and overturn one of the three days? When an officer is hurt in the line of duty the supervisor's job is to assist that officer and do everything he can to speed recovery and get the officer back on duty if possible. I have had people in my charge for many years and I have never witness this kind of behavior, lack of leadership and selfless attitude. OFC King's yearly Performance Appraisals are successful and he performs his job well. Good Leadership is hard to fine in Law Enforcement but because of the shear scope of your duties and dealing with the public and this is an example of what can happen when you do not have good leadership. I cannot dwell on Lt Peloquin leadership but I will say this; after working for him and with him the past nine years I can truly say he is not a good leader in the past and to date witness by all personnel in the Directorate of Emergency Services. Since this incident OFC King was reassigned to my charge and he has performed his duties flawlessly as a road officer and a Lead Police Officer (Patrol Supervisor). This incident was unjust and it needs to be corrected.

## DECLARATION

(Use back page or attachment if necessary. Initial each page; Place the Declaration, below, on the last page.)

I, the undersigned, declare under penalty of perjury that the statements made in the above affidavit are true and correct to the best of my knowledge, information, and belief. They are made voluntarily and without any benefit (actual or promised) offered in exchange for making these statements.

(sign) _Leo V. Birt_
Print   Leo V. Birt
Name

June 1, 2012
Date

Exhibit 6

James E. King   4/14/14   King vs. Department of the Army

1      Q    And what did you do after that?

2      A    I went to -- I filed -- I went to the chief and

3  I tried to get him to reverse it, and the chief wouldn't

4  reverse it, so I would to EEO after that.

5      Q    Was this all on the same day, Mr. King?

6      A    No, it wasn't.

7      Q    When you went to the chief, was that on the

8  11th?

9      A    No.  That was, I think, that Monday, whatever

10 that Monday was.

11     Q    And when you say "chief" --

12     A    Chief of police.

13     Q    What is his name, Mr. King?

14     A    Chief Willie McClinton.

15     Q    Is he still your current chief of police at Fort

16 Gordon?

17     A    Yes.

18     Q    Around that Monday, you stated, during your

19 first conversation, did he say anything to you about why

20 he would not reverse the leave -- excuse me -- the AWOL?

21     A    During the investigation when --

22     Q    No, sir.  Just during the first conversation you

23 had, when you first requested that he reverse it.

24     A    No.  He said give him my proof and stuff, and

25 he'll look into it.  So he was looking into it for quite a

1   came down.

2        Q     When you got that document about that reversal,

3   what did you understand to have taken place?

4        A     He just reversed it.  He didn't say why or

5   anything.  He just said that, you know, AWOL for the 1st

6   has been reversed.  He didn't give a reason.

7        Q     So prior to receiving that document, had you had

8   any conversations with the chief about the status of the

9   AWOL investigation?

10       A     Yes.  I had asked -- not only the chief, the

11  chief, Major Nyals [phonetic], and Major Chamblin.  I had

12  came to them and asked them to do an in-house

13  investigation, you know, about Lieutenant Peloquin, you

14  know, and my issue with him; that if he did that

15  investigation, they would know that the reason why he did

16  charge me AWOL, because of my EEO complaint.  He could

17  talk to any officer there and they would tell him.

18       Q     So at the time that Lieutenant Peloquin charged

19  you with AWOL, you had not yet filed the EEO complaint; is

20  that correct?

21       A     No.  I went to the chief first and see would he

22  do something about it.

23       Q     Now, you stated that you spoke with Major Nyals

24  and Major Chamblin.  Who are those people, Mr. King?

25       A     Major -- the DES director.  They had changed in

Exhibit 7

Case 1:12-cv-00193-JRH-BKE   Document 37   Filed 06/27/14   Page 31 of 36

James E. King   4/14/14   King vs. Department of the Army

1   type of leave he was going to allow you to use; is that

2   correct?

3        A    He said either workmen's comp, annual leave, or

4   sick leave.

5        Q    And during that first meeting you had with Chief

6   McClinton, did he say anything else about the AWOL

7   procedure?

8        A    No.

9        Q    How long after that meeting did you -- how long

10  before you contacted the EEO on Fort Gordon?

11       A    I don't have the exact date.  Sometime in

12  October sometimes.  I can't remember the exact date.

13       Q    What happened after you contacted the EEO

14  counselor?

15       A    They did a little investigation and took

16  statements of people.

17       Q    Now, you testified earlier that prior to the EEO

18  counselor's investigation, the chief reversed some of your

19  AWOL; is that correct?

20       A    He reversed one day, the one that I had the

21  doctor's note for already.

22       Q    Now, tell me about that.  How did you learn

23  about that reversal?

24       A    He gave me a document saying he reversed it.

25  That was sometime in February just before the investigator

# Exhibit 8

1    between.  So when the new one came in, I went to see would

2    he do something about it.

3        Q    What is DES, Mr. King?

4        A    Directory of Emergency Services.

5        Q    Okay.  Would that person have had supervisory

6    authority over your chief?

7        A    Yes.

8        Q    So at this time, the remaining AWOL is for

9    September 2nd, 2010, and September 6th, 2010; correct?

10       A    Yes.

11       Q    So what type of -- what did the reversal mean of

12   September 1st, 2010, financially?

13       A    They gave me back -- I mean, actually, really,

14   it didn't mean nothing because I had already had to take

15   money out of my TSP to cover the loss I had from the AWOL.

16       Q    When you say you took money from your TSP, can

17   you explain to me what you mean?

18       A    Thrift Savings Plan.  I took a loan out of it so

19   I could pay my bills.

20       Q    Does that mean that you were not paid for the

21   day you were charged for AWOL?

22       A    Yes.

23       Q    I understand that you're saying that you took a

24   loan from your TSP to cover --

25       A    Yes.  My bills, yes.

Exhibit 9

1      A    No.

2           MS. MALLORY:  Why don't we take a quick break.

3    We've been going for an hour and 15 minutes.

4           [NOTE:  Brief recess.]

5    BY MS. MALLORY:

6      Q    Just a couple more questions.  Mr. King, I

7    wanted to talk to you a little bit about the damages that

8    you're seeking in this case.  Okay?

9      A    Yes, ma'am.

10     Q    Are you claiming any past or future lost wages

11   for the claims in this action?

12     A    Yes, I am, but not actually wages.  I'm claiming

13   interest lost on the money that I had to take out to

14   defend myself and to make up for the money I had to take

15   to catch up on bills.

16     Q    And that's from the money that you took from TSP

17   to cover the loss from the two days of AWOL; correct?

18     A    And the interest rate I lost too from taking the

19   money out.

20     Q    Okay.  Are you claiming any future lost wages or

21   loss of earning capacity related to this case?

22     A    No.

23     Q    Do you allege that this incident has affected

24   your earning capacity?

25     A    Yes, because when you get charged with AWOL,

James E. King   4/14/14   King vs. Department of the Army

1   that goes on your file, and when you apply for a position,

2   like say if I want to get a job with top-secret clearance,

3   they look back and see that I've been charged with AWOL, I

4   probably won't get the clearance because of that.

5       Q    Do you receive any money from your medical

6   discharge at all, Mr. King?

7       A    No.  I filed a VA benefit claim.

8       Q    Other than your wages from your police officer

9   employment at Fort Gordon, do you receive any other

10  income?

11      A    No.  Other than wife or just from me?

12      Q    Just for you personally.

13      A    No.

14      Q    Have you had to personally cover any medical

15  bills relating to the incident with the suspect chase?

16      A    Just my deductible.  I believe workmen's comp

17  paid most of that back anyway.  Maybe like $35 they didn't

18  give me back from that.

19      Q    That's workers' compensation through the Fort

20  Gordon Police Department?

21      A    Civilian Personnel.

22      Q    So when you mentioned the interest that you're

23  seeking, can you approximate about how much that would be,

24  to the best of your knowledge at this time?

25      A    I took out -- I know the market right now, it's