IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

JAMES E. KING,                     *
                                   *
        Plaintiff,                 *
                                   *
    v.                             *        CV 112-193
                                   *
JOHN M. McHUGH,                    *
Secretary, Department of           *
the Army,                          *
                                   *
        Defendant.                 *

—————————

**O R D E R**

—————————

This case comes before the Court on Plaintiff James E. King's ("Plaintiff" or "King") allegations of racial discrimination and reprisal. By Order dated February 14, 2014, this Court dismissed all of King's claims save one: his retaliation claim regarding the three days he was charged Absent Without Leave ("AWOL"). (Doc. 28.) Now before the Court is Defendant's Motion for Summary Judgment as to that remaining claim. (Doc. 34.) For the reasons stated herein, Defendant's motion is **GRANTED**.

I.    **BACKGROUND**

A.    **King's Injury**

King, a police officer with the Directorate of Emergency Services at Fort Gordon, Georgia, filed the instant complaint alleging, *inter alia*, that Lieutenant Richard Peloquin ("Lt. Peloquin") retaliated against him for an August 23, 2010 Equal

Employment Opportunity ("EEO") complaint.[1]  (Fact-Finding Conference ("FFC"), Doc. 47, Exs. 1-2, at 8-9.)  On July 22, 2010, King was treated at the Dwight David Eisenhower Army Medical Center ("DDEAMC") Emergency Room for injuries he sustained while apprehending a suspect.[2]  (Id. at 11-12; Doc. 35, Exs. 3-4.)  King was diagnosed with bilateral knee contusions and a left thumb injury and excused from work for one day.  (Doc. 35, Exs. 3-4; Def. St. of Material Facts ("DSMF"), Doc. 35, ¶ 5; Pl.'s Resp. DSMF ("PSMF"), Doc. 38, ¶ 5.)  On July 27, 2010, Major Sheryl Bedno ("Dr. Bedno") evaluated King for a "return to duty assessment." (DSMF ¶ 6; PSMF ¶ 6.)  Given King's continued pain and swelling, Dr. Bedno recommended that King remain on bed rest for another three days until his next evaluation.  (DSMF ¶ 7; PSMF ¶ 7.)  Even so, King returned to work July 28 through July 30, 2010.  (Doc. 35, Ex. 6; DSMF ¶ 8; PSMF ¶ 8.)  Still having problems with his knees and thumb, King scheduled another return to duty assessment with Dr. Bedno on August 17, 2010.  (Doc. 35, Ex. 5; FFC at 18-19.)  In her Memorandum for Supervisor, Dr. Bedno stated:

> [King] will be referred for evaluation and possible treatment. At that time, a determination will be made as far as disposition. I recommend that he not continue work on patrol at this time but if available, can do light duty. Light duty needs to be defined at the time of his consultation with Sports Medicine/Orthopedics.

---

[1]    Lt. Peloquin was King's immediate supervisor.  (FFC at 9.)  His second-level supervisor was Chief Willie McClinton ("Chief McClinton").  (Id.)

[2]    On the day of the injury, Lt. Peloquin completed a Form CA-1, Federal Employee's Notice of Traumatic Injury and Claim for Continuation of Pay/Compensation, on King's behalf.  (Doc. 35, Ex. 2.)  This form was produced in connection with the "Office of Workers' Compensation Programs." (Id.)

(Doc. 35, Ex. 5.)   At this time, King went on "traumatic leave" and did not return to work.   (FFC at 20.)   King's consultation with Sports Medicine was scheduled for September 1, 2010.   (Id. at 41.) As King understood Dr. Bedno's Memorandum, he would remain on leave until Sports Medicine/Orthopedics filled out a CA-17 form (Duty Status Report) detailing his light duty requirements.   (FFC at 22.)

Following receipt of Dr. Bedno's August 17 Memorandum, Lt. Peloquin, at Chief McClinton's instruction, contacted Dr. Bedno to find out the date of King's Sports Medicine appointment and whether King could work as a blotter clerk or complete other desk duties in the meantime.[3]   (Id. at 58, 170.)   Lt. Peloquin made a second call to Dr. Bedno, again at Chief McClinton's direction, to ask whether King could answer a touch screen phone, to which Dr. Bedno responded in the affirmative.   (Id. at 62-64.)   Dr. Bedno then contacted King and reported that Lt. Pelqouin called to ask if King's profile could be changed so that he could sit and watch the blotter clerk work.   (Id. at 12.)   After this call, King purportedly researched federal privacy laws and called Dr. Bedno to explain "to her that [it] was illegal for her to change [his] profile just because [his] supervisor wanted [him] to come in to watch over a blotter clerk."   (Id. at 13.)   After that conversation, Dr. Bedno purportedly told King not to worry and that

---

[3]     According to Heather Grosvenor, a human resources representative, it is not unusual for a supervisor to seek clarification on work restrictions from a doctor.   (FFC at 261.)

she would not change his profile.   (Id.)   King reported this incident to an EEO official on August 23, 2010.   (Doc. 19, Ex. 13.)

## B.   King's AWOL Charges

Following his consultation with Sports Medicine on September 1st, King called Lt. Peloquin to tell him that he was not able to work his scheduled shift that day.   (Doc. 35, Ex. 13 at 3; Doc. 47, Ex. 3 at 33.)   And although King's doctor's appointment was on September 1, 2010, King represents that he did not receive his light duty assessment until September 2, 2010.   (FFC at 42.)   He did not, however, forward Lt. Peloquin this assessment until September 3, 2010.   (Doc. 35, Ex. 13.)   This light duty assessment purportedly excused King from work on September 1, 2010, but said that he could return to light duty on September 2, 2010.[4]   (FFC at 196 (Chief McClinton's testimony that the light duty form told King he could resume work on September 2, 2010).)

King did not return to work on September 2, 2010.   (FFC at 22-23; Doc. 47, Ex. 3 at 33.)   According to King, he sent Lt. Peloquin an e-mail dated September 2, 2010 stating that he would return to work on September 7, 2010.   (Doc. 47, Ex. 3 at 33.)   King apparently was having difficulty getting in touch with Lt. Peloquin regarding these absences after September 1, 2010, and so he also contacted a co-worker named "Peterson" and asked him to relay to

---

[4]   Neither party appears to have provided the Court with (1) the doctor's September 2nd e-mail to King or (2) the CA-17 form.

Lt. Peloquin that King would not return to work until the 7th.[5] (FFC at 23.) King acknowledges that he did not receive a response from any management official acknowledging or approving his September 1st, 2nd, and 6th absences. (Id. at 24.) King was ultimately marked as AWOL for those three days. (Doc. 35, Ex. 18.)

Lt. Peloquin's decision to mark King AWOL was purportedly due to his and others'[6] belief that King was in violation of the sick leave policy. Under Department of the Army policy, a federal employee absent on sick leave for more than three consecutive days must furnish a doctor's note.[7] (DSMF ¶ 15; PSMF ¶ 15; Doc. 35, Ex. 10.) A collective bargaining agreement similarly provides that non-firefighter personnel with absences due to being sick for five or more consecutive days must provide a medical certificate to support the absences. (Doc. 35, Ex. 11.) Much of this dispute centers on the interpretation of the Department of the Army's policy, and whether King was absent for three or more consecutive work days.

In the days leading up to Lt. Peloquin's decision to mark King as AWOL, Lt. Peloquin sent a number of e-mails to Heather Grosvenor, a human resources representative, on which King was

---

[5]    After the 7th came and went, King again called Peterson because he could not get in touch with anyone from management and asked Peterson to relay that he would return to work on September 10th. (Id. at 24.)

[6]    As will be discussed below, Chief McClinton affirmed Lt. Peloquin's decision (FFC at 180); a United States Army Time Attendance and Production System ("ATAPS") representative agreed that King was AWOL (id. at 114-15); and Human Resources agreed with the determination (id. at 178).

[7]    Defendant asserts that Exhibit 10 includes this Department of the Army policy. However, the attached exhibit refers to periods of sick leave of *five* or more consecutive days. Because all parties appear to agree that the Army policy was for *three* or more consecutive days, the Court assumes this to be true.

copied.[8]   (Doc. 35, Exs. 13, 16.)   Throughout these e-mails, Lt. Peloquin explained (1) his belief that King should have provided some sort of documentation from his doctor in order to remain on Leave Traumatic Injury (Id., Ex. 13 ("[F]or you to be out on Leave Traumatic Injury (LT) for 1 Sep, 2 Sep, or even later [] I would need documentation from Sports Medicine/Orthopedics for any period after you were reevaluated by them[.]")); (2) his understanding that Dr. Bedno's excuse note only applied up through his Sports Medicine visit on the morning of September 1, 2010 (Id. ("Dr. Bedno's excuse only could keep you out on Leave Traumatic Injury (LT) until you were reevaluated by Sports Medicine/Orthopedics.")); and (3) his opinion that King's doctors should have provided King with his light duty determination and any other documentation on the day of his appointment and that King should not have left without that paperwork (Id., Ex. 16 ("[The doctors] should have known that you needed to return to work and that they needed to look at your x-rays that day so that you could be returned to work. . . .  I do not know if you did, but you could have pressed them to . . . give you a light duty profile.")).

Lt. Peloquin additionally contacted United States Army Time Attendance and Production System ("ATAPS") personnel and was advised on November 8th that the AWOL charge was consistent with

---

[8]     In his various e-mails, Lt. Peloquin also references other phone calls and e-mails between King and himself, during which King purportedly never requested leave for September 2nd or September 6th.  (Doc. 35, Ex. 16 at 2 ("In the other email that I sent you and on the voicemail that I left on your cell phone's voicemail I asked you to call me if you wanted to request Leave Holiday for 6 Sep. You never called me and you never properly requested Leave Holiday or got it approved by me.").)

established policy, and that if King submitted the proper documentation Lt. Peloquin could change the designation to sick leave. (See FFC at 114-15.)[9]

Upon King's return to work on September 10, 2010, Lt. Peloquin requested a doctor's excuse for the three days in question, to which King responded "It's only been one day. Why I need a doctor's note?" (Doc. 47, Ex. 3 at 37.) King then said "Fine. I'll go back and get the doctor's note for you Monday[,]" but alleges that the next day Lt. Peloquin said "[w]ell, Officer King, I changed my mind. I'm not going to let you use your leave or give you leave. I'm just going to charge AWOL for those three days." (Id.) King did not bring in a doctor's note following this conversation because Lt. Peloquin "wasn't going to reverse it." (Id. at 39.)

As to the September 2nd absence, King maintains that he did not receive the proper documentation regarding the scope of his light duty until the afternoon of September 2nd, and he was still having trouble with his knees and thumb. (FFC at 17, 21, 42.) Thus, King intended to use his sick leave for September 2nd if Lt.

_____

[9]     According to Chief McClinton, the proper way to receive sick leave would be to contact the manager — here, Lt. Peloquin — and request sick leave by specifically referencing the dates requested. (FFC at 180.)
     King claims that upon his return to work, he was still compliant with the sick leave policy because Lt. Peloquin had not given him a sick leave slip. According to King, on a number of occasions he called in sick to work and Lt. Peloquin would then have the sick leave slip available upon his return. (Id. at 136.) And while Lt. Peloquin's testimony supports this general practice, he stated that King did not call in first and his e-mail indicating that he would be out until September 7th did not indicate the reason for his absence, whether it was for sick leave or other personal reasons. (Id. at 138.) King countered that it was clear to everyone why he was out — for his injury. (Id. at 140.)

Peloquin would not carry over the traumatic injury leave. (Id. at 29 ("[F]or the 2nd I was going to use my sick leave if he wasn't going to let me be out on traumatic leave."). As to September 6, which was Labor Day, King avers that he was never required to work on that day because "you can't work on holidays while you're on light duty."[10] (Id. at 28 ("But when you're on light duty, you're not — they don't let you come on because that's double time and you're not going to get paid for that.").)

In King's questioning of Lt. Peloquin at the Fact Finding Conference, King appears to admit that Lt. Peloquin offered him an opportunity to avoid the AWOL charge and utilize some other type of leave:

| | |
|---|---|
| King: | "You did not give me the opportunity to use sick leave or any other leave." |
| Lt. Peloquin: | "When we discussed that earlier, I had asked you if there was any other way you wanted to cover that period, and you said no.  You didn't have a doctors excuse —" |
| King: | "True." |
| Lt. Peloquin: | "— and you didn't have any other way to cover it.  Just do what I was going to do.  So I walked back to my office, I thought about it, I filled out the paperwork and I came back and presented it to you."[11] |

---

[10]     As evidence of this holiday leave policy, King provides the affidavit of Leo V. Brit stating "[b]y regulations all officers have to be in a full duty status to perform Law Enforcement duties at Fort Gordon." (Doc. 37, Ex. 5.)

[11]     King testified that at all relevant times, he only had a few hours of sick leave available, but it was his understanding that he could use his annual leave.  (FFC at 141-42.)

(FFC at 99-100.)

On September 11, 2010, Lt. Peloquin formally charged King AWOL for the three absences. (Doc. 35, Ex. 18.)   King was notified of the AWOL charges on September 12, 2010 and appealed them to Chief McClinton pursuant to union grievance procedures. (FFC at 27; DSMF ¶ 37; PSMF ¶ 37.)   Chief McClinton later rescinded the September 1, 2010 charge but upheld the other two.[12]   (Doc. 35, Ex. 19.)   In rescinding the September 1, 2010 charge, Chief McClinton found that King was not required to report to duty because he had a doctor's appointment that morning and the CA-17 form stated that he would not return until September 2, 2010. (Id.)  According to King, he had to take out a loan from his Thrift Savings Plan in order to pay his bills as a result of these AWOL charges. (Doc. 47, Ex. 3 at 49.)   The three days AWOL apparently amounted to $850.00 in lost wages. (Doc. 7 ¶ 25.)

## C.   King's EEO Complaint

On August 23, 2010, King made his initial contact with an EEO official and received the Notice of Right to File a Formal Complaint of Discrimination on September 22, 2010. (Doc. 19, Ex. 13; Doc. 35, Ex. 21.)   In his formal EEO complaint, which was received on October 1, 2010, King alleged that Lt. Peloquin violated his medical privacy and used it against him for reprisal. (Doc. 35, Ex. 20.)   King additionally alleged that "this was a

---

[12]   Chief McClinton testified that his decision was in agreement with that of Human Resources. (FFC at 178.)

continue[d] reprisal against [him] for prior EEO complaint[.]" (Id.)

The EEO Administrative Judge granted summary judgment in Defendant's favor without a hearing, which was adopted by the Department of the Army on May 9, 2012. (Doc. 35, Ex. 22.) On September 27, 2012, the Equal Opportunity Commission then affirmed the Department of the Army's final action, finding that the Administrative Judge's decision was appropriate and that a preponderance of the record evidence did not establish unlawful discrimination. (Doc. 35, Ex. 23.) King then brought suit in this Court on December 20, 2012.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor." U.S. v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court,

by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex, 477 U.S. 317). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-

11

movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk of the Court gave Plaintiff notice of the motion for summary judgment and informed him of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 36.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motion is now ripe for consideration.

## III. **DISCUSSION**

To successfully set forth a claim of retaliation under Title VII, the plaintiff must first establish a prima facie case.

Olmstead v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998). If this prima facie case is met, a presumption of retaliation arises and the burden shifts to the defendant to "proffer a legitimate, non-retaliatory reason for the adverse employment action." Id.   If the defendant sets forth such a reason, the presumption disappears and the plaintiff must show that the reasons stated were merely a pretext. Id.; Masso v. Miami-Dade Cnty., 465 F. Supp. 2d 1260, 1264-54 (S.D. Fla. 2006).

"A prima facie case of retaliation contains three elements: 'first, the plaintiff engaged in statutorily protected conduct; second, the plaintiff suffered an adverse employment action; and finally, the adverse action was causally related to the protected [activity].'" Williams v. Motorola, Inc., 303 F.3d 1284, 1291 (11th Cir. 2002) (quoting Farley v. Nationwide Mutual Ins. Co., 197 F.3d 1322, 1336 (11th Cir. 1999)).   In determining whether activity is statutorily protected, the Supreme Court and Eleventh Circuit have recognized two categories of activity:  "An employee is protected from discrimination if (1) 'he has opposed any practice made an unlawful employment practice by this subchapter' (the opposition clause) or (2) 'he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter' (the participation clause)." Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1350 (11th Cir. 1999) (quoting 42 U.S.C. § 2000e-3(a)).   King relies on the latter — he participated with the EEO in reporting Lt.

Peloquin's violation of privacy laws, an act which in and of itself King claims was retaliation.

## A.    Prima Facie Case

Defendant does not dispute that King meets the first and third prongs of the prima facie case and the Court agrees.  King clearly engaged in statutorily protected activity when he contacted an EEO official with his complaint on August 23, 2010.  See Wesolowski v. Napolitano, 2 F. Supp. 3d 1318, 1345 (S.D. Ga. 2014) (citing Eastland v. Tenn. Valley Auth., 704 F.2d 613, 627 (11th Cir. 1983) for the proposition that contacting an EEO counselor is protected activity).   Moreover,  the  close  temporal  proximity  between  the protected activity and AWOL charges is sufficient to raise an inference of causation.  See Bechtel Constr. Co. v. Sec'y of Labor, 50 F.3d 926, 934 (11th Cir. 1995).[13]   Instead, Defendant makes just one challenge to King's prima facie case: that the September 1st AWOL charge was not a materially adverse action because it was rescinded on appeal.[14]

"The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006).   The Supreme Court has thus drawn a distinction between

---

[13]    This Circuit does, however, recognize an exception to the general rule that temporal proximity alone can raise an inference of causation where the defendant presents unrefuted evidence that the decision maker was unaware of the protected conduct.  Clover, 176 F.3d at 1355-56; see also Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000) (FMLA).  Here, no evidence has been presented one way or the other to address what Lt. Peloquin knew about King's August EEO meeting.  Accordingly, the present situation does not fall into the Clover exception.

[14]    Defendant does not challenge that the September 2nd and September 6th AWOL charges are materially adverse actions.

"*material* adversity" and "trivial harms" or "normally petty slights, minor annoyances, and simple lack of good manners[.]" Id. at 68 (emphasis in original). To qualify as a sufficiently adverse action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. (internal quotations and citations omitted). The inquiry is necessarily a fact-specific one, and the Supreme Court has intentionally phrased "the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." Id. at 69.

Here, King avers that he suffered a materially adverse employment action when he was charged AWOL for three days. According to King, the AWOL charges are materially adverse for three reasons: (1) "King was required to take a loan from his Thrift Savings Plan in order to pay his bills;" (2) "the marking of AWOL has the potential to affect [] earning capacity since the AWOL is on [King's] file and may prevent him from getting a different position or a security clearance;" and (3) "the difficulty of having to go through union procedures over 5 months to recover lost income would dissuade a reasonable worker from making an EEO complaint." (Doc. 37 at 4-5.) King alleges that as a result of the AWOL charge, he lost $850.00 in wages, although the portion of that loss attributable to September 1st was reimbursed. (See Doc. 7 ¶ 25.)

The defendant's argument in Burlington mirrors that of Defendant today.   There, the plaintiff alleged that his 37-day suspension without pay was a materially adverse action.   The defendant countered that "because Burlington ultimately reinstated White with backpay" his suspension "lacked statutory significance[.]" Burlington, 548 U.S. at 71.   The Supreme Court, in upholding the jury's determination that the defendant suffered a materially adverse action, found that "[m]any reasonable employees would find a month without a paycheck to be a serious hardship." Id. at 72.   Admittedly, one day without pay is a far cry from 37 days without income.   This Court finds, however, that King has alleged a sufficient injury to create a genuine issue of material fact.   Indeed,

> [t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.   A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children.   A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight.   But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.   Hence, a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an act that would be immaterial in some situations is material in others.

Id. at 69 (internal quotations and citations omitted).   It is not for this Court to decide that a day without pay, even if reimbursed, and the difficulty of contesting the AWOL

16

determinations would not dissuade a reasonable person from engaging in protected activity.  The Court thus finds that King has set forth a prima facie case of retaliation.

**B.    Legitimate, Non-Discriminatory Reason**

The Court similarly concludes that Defendant's proffer of a legitimate, non-discriminatory reason for King's AWOL charges — failure to comply with leave procedure — eliminates any presumption of retaliatory intent.   Indeed, Lt. Peloquin repeatedly asked King to produce medical documentation; he sought guidance from human resources, although it apparently went unanswered; and he testified that it was his understanding that he could not give an employee sick leave without a doctor's note.  (FFC at 122.)  Chief McClinton reiterated as much in his memorandum upholding two of the AWOL charges: "By your actions of failing to return to duty after your appointment on 1 September 2010, you failed to properly request leave and have leave approved for you."  (Doc. 35, Ex. 19.)   The Court therefore finds such reasons amply sufficient to meet Defendant's minimal burden of production at this stage.   <u>See</u> <u>McDonell v. Gonzales</u>, 151 F. App'x 780, 783 (11th Cir. 2005) (per curiam) (finding that the employer "articulated legitimate, non-discriminatory reasons" for its employment decision, including the employee's "failure to comply with leave request procedures").

**C.    Pretext**

As alluded to above, in order "to avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination."

17

Clark, 990 F.2d at 1228 (citation omitted).   The law of this Circuit is clear: "A reason is not pretextual unless it is shown both that the reason was false, and that retaliation was the real reason."   Burgos-Stefanelli v. Sec'y, U.S. Dep't of Homeland Sec., 410 F. App'x 243, 247 (11th Cir. 2011) (citing Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala., 446 F.3d 1160, 1163 (11th Cir. 2006)); Morrison v. City of Bainbridge, Ga., 432 F. App'x 877, 881 (11th Cir. 2011) (same).   "A plaintiff does not demonstrate pretext by showing that the defendant had a mistaken belief about the facts that formed the basis for the alleged non-retaliatory reason. Instead, the plaintiff must present evidence that the defendant did not honestly believe the facts on which it based its non-retaliatory reason."   Smith v. Constr. Datafax, Inc., 871 F. Supp. 2d 1226, 1239 (N.D. Ala. 2012) (internal citations omitted). To do so, King "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."   Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1265 (11th Cir. 2010) (internal quotations omitted).

> A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer.   Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.

Chapman v. Al Transp., 229 F.3d 1012, 1030 (11th Cir. 2000).

King makes only one argument in regard to pretext: He did not violate the leave policies and therefore Defendant's reason is pretextual.[15]   As discussed above, an employee must submit medical documentation to use sick leave where that employee is out for three or more consecutive days.   King maintains that he did not violate these policies, as he only used sick leave for one day.[16] Thus, "[w]ithout a violation of the [sick leave policies] there is no justification for making Mr. King AWOL on September 1, 2, and 6, 2010 and Mr. King can demonstrate that the reason offered by the Defendant is a pretext."   (Doc. 37 at 9.)

Even assuming that Defendant's stated reason is false and that King was in fact compliant with all applicable leave policies, King does nothing more than quarrel with his superiors' interpretation of the policy, offering no argument whatsoever to support a conclusion that retaliation was the true reason.   And while the Court does not doubt King's beliefs are sincerely held, the

---

[15]   King's brief provides just two paragraphs of argument explaining the Army policy and why King did not violate it.   In addition, King provides a table showing the days he was absent from work and the reasons for those absences.   In the Statement of Facts of King's response, King additionally asserts that he "is the only person that Lt. Peloquin has ever marked AWOL." (Doc. 37 at 4.)   The Court finds that this one-sentence statement does not give rise to a factual dispute.   King fails to provide any citation to the record for this proposition, and similarly provides no argument regarding similarly situated comparators.

[16]   It appears to be Lt. Peloquin's and Defendant's belief that September 1st, 2nd, and 6th constitute the three consecutive days under the policy. King, however, maintains that he only used one day of sick leave — the 2nd — and thus fell outside the policy's requirements.   According to King, he was still covered under his traumatic injury leave on the 1st, as he had not received his light duty profile.   As to the 6th, King maintains that Army policy prohibits light duty on holidays.   This is the precise sort of factual dispute that ordinarily must go before a jury.   However, as detailed above, King must show both that the stated reason was false *and* that retaliation was the true reason.   Thus, even though King's interpretation of the policy could, if believed by a jury, suffice to show that the reason was false, it does nothing to address whether retaliation was the true reason.

"pretext inquiry is concerned with the employer's perception . . . , not the employee's own beliefs." Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1332-33 (11th Cir. 1998). The undisputed evidence shows that Lt. Peloquin repeatedly contacted human resources for clarification on his interpretation of the policy and received an e-mail from ATAPS confirming that AWOL was the correct charge. In the face of Lt. Peloquin's diligence, King presents no evidence that Lt. Peloquin's true motivation was reprisal for the August 23rd EEO complaint.[17]

Simply put, King does not make the critical connection between the allegedly incorrect application of the leave policy and a subjective intent to retaliate. See Jones v. Gerwens, 874 F.2d

---

[17]    King did submit his own affidavit in response to Defendant's motion for summary judgment, although he does not reference it in his argument, instead only relying on it for his recitation of the facts. (Doc. 37, Ex. 1.)  In that affidavit, he makes the following statements in regard to the August 23, 2010 EEO complaint:

1. "On September 12, 2010, Lt. Peloquin retaliated against me again because I had complained on August 23, 2010 and filed an EEO complaint about Lt. Peloquin attempting to change my doctor's opinion and marked me AWOL September 1st, 2nd, and 6th."   (Id. ¶ 5.)
2. "To the best of my knowledge and belief Lt. Peloquin never requested a physician clarification for other officers in our unit that Lt. Peloquin supervised[.]"  (Id. ¶ 10.)
3. "Lt. Peloquin retaliated against me for my prior EEO involvement and complaints about his improper interference with my physician by changing his mind and marking me AWOL[.]"  (Id. ¶ 13.)
4. "Who would mark a police officer AWOL for an injury he incurred while performing their police duties? Obviously this was a personal matter to him."  (Id. ¶ 14.)

With the exception of Paragraph 10, each of these statements does nothing more than King did in his brief: make conclusory allegations that Lt. Peloquin acted out of retaliation.  As to Paragraph 10, King presents no argument regarding similarly situated comparators who were not marked AWOL under similar circumstances.  Because King failed to raise any such argument, the Court declines to address it sua sponte.  See United States v. Nuckles, No. 1:14-cr-218, 2015 WL 1600687, at *21 (N.D. Ga. Apr. 7, 2015) (listing cases for the proposition that a party abandons claims not argued in briefs).

1534, 1540 (11th Cir. 1989) (holding that even if employer incorrectly believed that the employee violated employer's policy, if employer acted on this belief, it is not guilty of racial discrimination); Smith v. Papp Clinic, P.A., 808 F.2d 1449, 1452-53 (11th Cir. 1987) ("[I]f the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of race' and the employer has not violated § 1981."); Nix v. WLCY Radio/Rehall Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984) ("The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."). Indeed, to find an employer violated Title VII simply because the employer incorrectly believed an employee did not comply with procedure — without any other evidence of retaliation or discrimination — would only make this Court a "super-personnel department that reexamines an entity's business decisions," which it will not do. See Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991).

Finally, and while not argued by King, the temporal proximity between the protected activity and adverse action would not save his claim. Indeed, "temporal proximity alone does not show pretext." Gerard v. Bd. of Regents of State of Ga., 324 F. App'x 818, 827 (11th Cir. 2009) (per curiam); Jackson v. Hennessy Auto, 190 F. App'x 765, 768 (11th Cir. 2006) (per curiam) ("Although a

21

plaintiff can use temporal proximity to show a defendant's proffered reason for termination was pretextual, temporal proximity alone does not establish pretext.").

## IV.  CONCLUSION

Based upon the foregoing, Defendant's Motion for Summary Judgment (doc. 34) is hereby **GRANTED**. The Clerk is **DIRECTED** to enter **FINAL JUDGMENT** in favor of Defendant. The Clerk shall terminate all deadlines and motions and **CLOSE** the case.

**ORDER ENTERED** at Augusta, Georgia, this _5th_ day of May, 2015.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA